LONNIE JOHNSON *and* HATTIE S. JOHNSON

*v.*

JUNIOR POCAHONTAS COAL CO., INC.

(No. 13686)

Decided March 29, 1977.

262

*Camper & Watson, Wade T. Watson, Harry G. Camper, Jr.* for appellants.

*Tutwiler, Crockett & LaCaria, Charles A. Tutwiler* for appellee.

McGRAW, JUSTICE:

By judgment order of March 10, 1975, the Circuit Court of McDowell County sustained defendant's motion for summary judgment and dismissed plaintiffs' action. By order of March 26, 1975, the trial court overruled plaintiffs' motion to set aside or to amend or alter the court's judgment order of March 10, 1975, sustaining defendant's motion for summary judgment, and again ordered dismissal of plaintiffs' action. The action is before this Court on plaintiffs' appeal from the judgments of the trial court.

Plaintiffs, Lonnie Johnson and Hattie S. Johnson, husband and wife, commenced their action against defendant, Junior Pocahontas Coal Co., Inc., for recovery of actual, punitive and treble damages claimed to have resulted to their residence property at Berwind, McDowell County, as a result of defendant's surface mining, drilling and blasting operations near their home. Defendant's motion for summary judgment was based on exceptions and reservations contained in the deed whereby plaintiffs acquired their residence property—exceptions and reservations allowing and permitting mining operations on and about plaintiffs' property "without liability for damage and injury to and destruction of the surface thereof or to anything now or hereafter therein and thereon, including but not limited to buildings, structures and improvements, growing things, pipes, lines and ways, wells, springs and water courses."

In sustaining defendant's motion for summary judgment, the trial court found that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), R.C.P.

Counsel for defendant contend (1) that the exculpatory clauses in the deeds in the chain of title to plaintiffs' real property are enforceable by defendant and (2) that

there is no dispute as to any material fact, and conclude that the trial court's judgment granting defendant's motion for summary judgment is to be affirmed.

Counsel for plaintiffs contend that three issues are involved: (1) whether plaintiffs are barred from maintaining their action for damages because of exculpatory clauses, regardless of defendant's negligence in its mining operations; (2) whether the exculpatory clauses are void, unenforceable and invalid; and (3) whether genuine issues of material fact exist for resolution at a trial of the action.

By deed of June 1, 1956, New River and Pocahontas Consolidated Coal Company, owner of coal lands in McDowell County, conveyed thirteen parcels of surface lands in the town of Berwind to Paul W. Jones, Trustee, excepting and reserving the coal and the mining rights therein and thereunder. By deed of August 15, 1956, Paul W. Jones, Trustee, conveyed a parcel of surface land to plaintiffs in this action, subject to the "conditions, exceptions, reservations and limitations as contained in all prior deeds conveying the said real estate same as though they were set out herein *in extenso.*" By agreement of lease, dated August 18, 1961, New River and Pocahontas Consolidated Coal Company, as lessor, leased to Consolidation Coal Company, as lessee, many tracts of coal lands, including tracts in and near the town of Berwind, McDowell County, providing, among other covenants and conditions, that lessee "shall conduct its mining operations as not to violate any rights of lateral and subjacent support belonging to the owners of other estates." By agreement of September 1, 1961, the lessee, Consolidation Coal Company, entered into arrangements with Junior Pocahontas Coal Company, defendant in this action, whereby Junior Pocahontas Coal Company, as an independent contractor, would strip mine certain seams and areas of coal in and underlying the leased lands and deliver the coal to Consolidation Coal Company at a production cost of $4.15 per ton. Plaintiffs' complaint alleges that the defendant Junior Pocahontas Coal Company, while engaged "in the busi-

ness of coal mining, including strip mining and doing all acts necessary to the operation of said business, including drilling, blasting and the moving of earth, rock and debris", did, "in a negligent, careless and reckless manner", damage the residence property of plaintiffs and others in the area. Paragraph (8) of plaintiffs' complaint alleges:

"As a direct and proximate result of the surface mining, drilling and blasting operations by the defendant company, and/or its negligent acts and failures to act in carrying on its surface mining, drilling and blasting operations, as aforesaid, and/or its wilful and wanton conduct in reckless disregard of the rights of others, including the plaintiffs, as aforesaid, plaintiffs' real estate, house and other improvements thereon were greatly injured and damaged, including cracks, buckling and damages into and about its foundation, walls, ceilings, floors and windows of the dwelling house, walks and walls adjacent or near thereto, by reason of which injury and damages many portions of plaintiffs' premises will have to be repaired, rebuilt or restored to the extent possible, and by reason of which acts and conduct of the defendant, the plaintiffs' use and enjoyment of said property has and will in the future be greatly interfered with, and the plaintiffs' premises and property has been caused to greatly depreciate in value all to the damage of the plaintiffs in the actual sum of, to-wit, $10,000.00."

In the concluding paragraph of their complaint, plaintiffs ask for actual and compensatory, punitive and treble damages in the following language:

"WHEREFORE, the plaintiffs, Lonnie Johnson and Hattie S. Johnson, demand judgment against the defendant company, Junior Pocahontas Coal Company, Inc., for actual and compensatory damages in the sum of $10,000.00; and/or said plaintiffs demand judgment against said defendant in the sum of $5,000.00 for punitive damages; and/or said plaintiffs demand judgment against

said defendant in the sum of $35,000.00 as provided by Chapter 20, Article 6, Section 30 of the Code of West Virginia, as amended, and their costs in this proceeding."

Defendant, in its answer, denies conducting its mining operations "in a negligent, careless and reckless manner", denies that "it used excessive amounts of explosives" in the blasting charges, and affirms that it used care in its operations and followed provisions of rules, regulations and laws relating to strip mining. Further, as an affirmative defense, defendant asserts that the exceptions and reservations contained in the deed of June 1, 1956, made by New River and Pocahontas Consolidated Coal Company to Paul W. Jones, Trustee, through which plaintiffs acquired their surface land residence property, insulate defendant from liability for any damages to plaintiffs' property. In defendant's brief, counsel contend:

> "It is the contention of the defendant in these cases that by reason of the specific language contained in the deed from New River to Jones, Trustee, the defendant, conducting its strip-mining operations by virtue of the contract with Consolidation Coal Company, it being the Lessee of New River, that it is not liable for damage, if any, to the improvements and/or the surface of the various lands, in that the plaintiffs are bound by the conditions, etc., contained in the deed from New River to Jones, Trustee.

> "It is noted that the deed from Jones, Trustee, to the various plaintiffs, conveys the surface only, setting out that it is a part of the property conveyed to Jones, Trustee, by New River and specifically making said deed subject to the conditions, restrictions, reservations and limitations as contained in all prior deeds, conveying said real estate the same as though they were set out herein *in extenso*."

Further, in its brief, defendant "relies primarily" on the Court's decision in *Stamp v. Windsor Power House*

*Coal Company,* 154 W. Va. 578, 177 S.E.2d 146 (1970), quoting the syllabus of the opinion as follows:

> "Where a deed conveys the coal under a tract of land, together with all the rights and privileges necessary and useful in the mining and removal of said coal, including the right of mining the same with or without leaving any support for the overlying strata, and without liability for any injury which may result to such overlying strata or to the surface, or to water courses or roads or ways by reason of the mining and removal of said coal, the grantee is not liable for damages to the surface or to structures upon the surface, which damages result from surface subsidence proximately resulting from the mining and removal of such coal."

Plaintiffs' brief cites and relies on *Mullins v. Beatrice Pocahontas Co.,* 432 F.2d 314 (Cir. 4th 1970), construing and applying Virginia's property and coal mining law in a damage action somewhat comparable to the present case. In the *Mullins* case, coal dust emissions from the mining operation in and near residential areas were involved. The United States Court of Appeals for the Fourth Circuit noted in its opinion that the deeds "show on their face that the company intended people to live and work in the subdivisions it created. When all provisions of the Red Jacket deeds are considered as a whole, it is plain that the parties never contemplated that the grantor through the emission of needless dust could seriously impair the rights it had granted the owners of the surface." The Court then concluded:

> "We conclude, therefore, that Pocahontas can emit only that amount of coal dust reasonably necessary to produce marketable coal. It cannot impose on these property owners the cost of its pollution if means of collecting the dust are reasonably available. Accordingly, the case presents at least these genuine issues of fact: (1) the amount of dust the plant emits; (2) the effect of this dust on the appellants' health and property; and (3) whether the emission of the dust is rea-

sonably necessary for the production of coal in the ordinary manner, or whether it has been caused by improper operating procedures or ineffective equipment. Summary judgment, therefore, was not appropriate."

## I. The Exculpatory Clauses

As above stated, defendant, in its answer to the complaint and in its brief, strongly relies for its defense on exculpatory clauses embracing the exceptions and reservations in the deed of June 1, 1956, from New River and Pocahontas Consolidated Coal Company to Paul W. Jones, Trustee. In their brief and arguments plaintiffs devote much time and attention to minimizing and dissolving the defense of the exculpatory clauses as interposed by defendant. It is apparent that all parties to the action consider the exculpatory clauses to be of significant weight. Paragraphs First and Fifth of the exceptions and reservations in the deed are as follows:

"FIRST: All coal, oil, gas, other minerals and mineral substances in and under the described and conveyed real estate, with all necessary or convenient mining, production, transportation and utility rights, rights-of-way and easements for the mining, production and transportation thereof, together with the right to haul and transport coal oil, gas, other minerals and mineral substances but not upon and over, the surface of the real estate herein described and hereby conveyed from any and all other lands wherever situate, and the right to mine, produce, remove and carry away all and the entire amount and body of the coal, oil, gas, other minerals and mineral substances in and from and adjacent to the described and conveyed real estate, without liability for damage and injury to and destruction of the surface thereof or to anything now or hereafter therein and thereon, including but not limited to buildings, structures and improvements, growing things, pipes, lines and ways, wells, springs and water courses."

"FIFTH: The right to construct, maintain, use and operate, adjacent to and within the vicinity

of the described and conveyed real estate, coal tipples, loading facilities, preparation and cleaning plants and facilities, coke and by-product structures and facilities, gob and refuse dumps and piles, whether burning or not, pumps and drains and all other mining plant, appurtenances and operations, without liability for damage or injury to and destruction of said real estate and anything now or hereafter therein and thereon, including but not limited to buildings, structures and improvements, trees and other growing things and property, arising out of or resulting from, including without limitation, noise, vibration, smoke, dust, fumes, noxious gases, air pollution, stream pollution, water stagnation, erosion, deposits of waste, silt, coal dust and other substances, discharge of mine waters through natural or artificial courses and channels, and diversion of waters and streams."

The deed of August 15, 1956, whereby plaintiffs acquired their surface land residence property, is made subject to the "conditions, restrictions, exceptions, reservations and limitations" in the above-referenced deed of June 1, 1956. The deed of June 1, 1956, retaining the minerals and mining rights but conveying the surface lands, provided that the surface lands so conveyed "shall be used for residential and gardening purposes only." In the agreement of lease, dated August 18, 1961, whereby the owner of the minerals leased to Consolidation Coal Company tracts of coal land in and near the town of Berwind, the lessee was required to leave sufficient coal in place to support existing buildings of others on the surface lands. Later the lessee entered into an agreement with Junior Pocahontas Coal Company, defendant in this action, for strip mining certain seams of coal, subject to "rights, terms, conditions, provisions, restrictions and stipulations contained in the papers under which Consolidation (the lessee) is in possession of the property known as the Berwind property."

The record affirms that the surface land acquired by plaintiffs was for many years devoted to residence uses,

that plaintiffs resided thereon, that plaintiffs paid a valuable consideration for the property, that the coal severance deed provided the surface land areas were to "be used for residential and gardening purposes only", and that the coal lease and mining contract emanating from the severance deed transaction contained indemnity provisions recognizing protective considerations incident to possible claims for damages to the surface land residence properties. The exceptions and reservations in the coal severance deed manifest the intent to mine and remove coal from beneath the surface land areas and, at the same time, the transaction obviously comtemplated continued use of the surface lands for residential and gardening purposes.

The Court cannot foresee what evidence may be offered by plaintiffs at a trial in support of the allegations in their complaint. They charge that defendant "conducted and performed its said surface mining, drilling and blasting operations in a negligent, careless and reckless manner . . . in failing to follow and obey rules, principles, regulations, provisions and/or laws . . . as the same pertain to strip mining and blasting operations." Further, the complaint charges that the "acts and conduct of the defendant company . . . in mining, drilling and blasting, as aforesaid, were wilful, wanton and in reckless disregard of the rights of plaintiffs." The allegations in paragraph (8) of the complaint, as above quoted, may, on presentation of evidence, show a nuisance situation somewhat comparable to the conditions indicated in *Mullins v. Beatrice Pocahontas Co., supra.* While the exculpatory clauses in this case, obviously considered important by plaintiffs and defendant, may conceivably insulate defendant from some tort liabilities, the clauses may not be raised as a complete shield from all liabilities which may be indicated by evidence showing defendant's violations of rules, regulations and laws, its wilful, wanton and reckless actions and conduct, or its creation of hazardous or nuisance conditions incident to its strip mining operations causing the injuries and

damages set forth in plaintiffs' complaint. 41 Am. Jur. 2d, *Independent Contractors,* §§ 34, 41, 45 (1968).

## II. The Independent Contractor

On review of the trial court's dismissal of plaintiffs' action on motion for summary judgment because of the finding that there was no genuine issue as to any material fact for jury trial, and despite the basic emphasis placed by counsel on the importance of the exculpatory clauses, the Court may not disregard other obvious issues manifest in the record. Plaintiffs elected to commence their action against a single defendant, an independent contractor directly charged with the injuries and damages to their residence property. The Court is obliged to consider whether the complaint and answer, the two pleadings in the record, present any genuine issues of material facts for trial, apart from and independent of the exculpatory clauses.

Differences are readily noted between the arguments advanced and the authorities cited by counsel in their briefs with emphasis on the exculpatory clauses and the issues and principles of law which may control the determination and disposition of the action now before the Court. In the *Mullins* case, *supra,* it appears that the plaintiffs owned their property subject to mineral severance deeds which vested in the defendant, Beatrice Pocahontas Company, coal mining and removal rights. In the *Stamp* case, *supra,* it appears that plaintiffs owned their property subject to a coal severance deed which vested in the defendant, Windsor Power House Coal Company, coal mining and removal rights. In the present litigation it appears that New River and Pocahontas Consolidated Coal Company owns the coal and, as lessor, has leased certain coal mining and removal rights to Consolidation Coal Company, as lessee. The lessee has entered into an agreement whereby the defendant, Junior Pocahontas Coal Company, as an independent contractor, agrees to strip mine certain seams of coal and to deliver the coal to lessee at a fixed production cost per ton. Under the strip mining agreement,

Junior Pocahontas Coal Company owns and holds no estate or interest in the coal properties embraced in lessee's leasehold estate. The independent contractor is obliged to furnish the equipment and workmen to remove the coal and deliver it to lessor. The independent contractor does not own the coal in place or as removed. The situation is somewhat comparable to the gas well drilling arrangements in *McCoy, Hall and Arbogast v. Cohen*, 149 W. Va. 197, 140 S.E.2d 427 (1965). Other illustrations are noted in 41 Am. Jur. 2d, *Independent Contractors*, § 9 (1968). While privity of estate may exist between the owner of the coal and the lessee, only privity of contract exists between the lessee and the independent contractor. In 20 Am. Jur. 2d, *Covenants, Conditions, and Restrictions*, § 34, the distinction is well stated as follows:

> "A distinction is made between privity of contract and privity of estate, and the rule is that privity of contract alone is insufficient to carry the benefit of a covenant to subsequent owners of the property. Similarly, a difference is indicated between the benefit and the burden with respect to the necessity for privity of estate. Thus, while the benefit, upon a transfer of land, will pass with the property to which it is incident, the burden or liability will be confined to the original covenantor, unless the relation of privity of estate exists or is created between the covenantor and the convenantee at the time when the covenant is made."

In the agreement of September 1, 1961, between the lessee, Consolidation Coal Company, and the independent contractor, defendant in this action, Article Eleven provides:

> "It is understood and agreed by and between the parties hereto that the operations of Junior, as herein contemplated, shall be conducted in a manner consistent with and subject to the rights terms, conditions, provisions, restrictions and stipulations contained in the papers under which Consolidation is in possession of the property

known as Berwind property. All royalties on the coal to be mined hereunder shall be borne by Consolidation."

Those provisions constitute contract language in the agreement between the lessee and the independent contractor by which the parties agree to be bound. The language is not intended to insulate and does not legally insulate the independent contractor's strip mining operations from tort liability to third parties. Nor does the language in the independent contractor's agreement insulate the defendant's strip mining operations from tort liabiity to plaintiffs who own their nearby surface land residence property under a deed limited by conditions, exceptions and reservations constituting the exculpatory clauses on which defendant bases its defense to plaintiffs' action for damages. These plaintiffs, and other surface land residence property owners similarly situated who have actions pending in the trial court, are not parties bound, obligated or limited by the terms and provisions of the independent contractor's agreement. When a plaintiff, so situated, is satisfied as to the responsibility and the solvency of the independent contractor, he may elect not to look beyond the independent contractor, the immediate cause of his complaint, to other parties to whom liability may attach for the damages he may claim.

---

In *Aetna Casualty & Surety Co. v. Federal Insurance Co.*, 148 W. Va. 160, 133 S.E.2d 770 (1963), cited by both plaintiffs and defendant in their briefs, the Court held, in point 6 of the syllabus, that

> "A party who moves for summary judgment has the burden of showing that there is no genuine issue of fact and any doubt as to the existence of such issue is resolved against the movant for such judgment."

In view of the allegations in plaintiffs' complaint and the defenses interposed in defendant's answer thereto, it appears that a broad spectrum of issues of fact as to tort

liability of defendant remains for resolution in the trial court. Rule 56, R.C.P. With genuine issues of material facts remaining for consideration and determination, it is apparent that the trial court erred in granting defendant's motion for summary judgment and dismissing plaintiffs' action. The judgments of the Circuit Court of McDowell County, entered on March 10, 1975, and March 26, 1975, are reversed and this cause is remanded for further development and proceedings consistent with the foregoing opinion.

*Reversed and remanded.*

NEELY, JUSTICE, *dissenting:*

I respectfully dissent from the majority's holding as set forth in syllabus pt. 3, which indicates that the rights and duties of independent contractors, carrying out work at the instance and under the direction of landowners, may be analyzed in terms of privity of contract and privity of estate. In my view the majority's discussion concerning privity of contract and privity of estate both misses the point and is wrong.

The facts are not in dispute. On June 1, 1956, the New River and Pocahontas Consolidated Coal Company conveyed certain parcels of surface land in Berwind to Paul W. Jones, Trustee. By the terms of this conveyance the grantor reserved all mineral rights, as well as certain appurtenant rights relating to the mining, production, and transportation of minerals. Further, the grantor conveyed the surface rights subject to a broad exculpatory clause releasing grantor from all liability for damage that mineral production might cause to the surface itself, improvements to the surface, crops, and water. The surface property interest acquired by Paul W. Jones, Trustee, was thus quite limited, as Paragraphs First and Fifth of the deed, set out in the majority opinion demonstrate. Nevertheless, no one contends that the owner of land cannot convey the surface subject to restrictions and limitations which enhance his enjoyment of the retained mineral interest.

On August 15, 1956, the plaintiffs in this action, Lonnie and Hattie Johnson, acquired one parcel of surface land from Paul W. Jones, Trustee. Their deed recited that they took the property subject to the "conditions, exceptions, reservations, and limitations as contained in all prior deeds conveying the said real estate same as though they were set out herein *in extenso*." Accordingly, the property interest acquired by the Johnsons was limited by the reservation of mineral rights in their chain of title as well as by certain convenants and restrictions, related to the mineral reservation, which ran with the land.

By agreement dated August 18, 1961, Consolidation Coal Company acquired New River's mineral estate by lease. Subsequently, on September 1, 1961, Consolidation made arrangements with Junior Pocahontas Coal Company to serve Consolidation as an independent contractor and to operate upon the leased property, including the property involved in this case.

Plaintiffs Lonnie and Hattie Johnson instituted this action against Junior Pocahontas, alleging it conducted mining operations negligently or in willful and wanton disregard of the rights of others, and further alleging that their property was damaged as a proximate result of the mining operations. Defendant denied that its mining operations were conducted in a negligent, careless and reckless manner. The complaint and answer thus appear to set up genuine issues as to material facts. The trial court, however, granted summary judgment to defendant on the basis of its affirmative defense, namely, the exculpatory clauses in the plaintiffs' chain of title. The question whether such exculpatory clauses are valid has therefore been squarely presented to this Court.

I would rather see the Court confront this issue head-on than sidestep it by creating an independent contractor exception to limit the applicability of exculpatory clauses in certain situations. This *ad hoc* solution may stem from an understandable aversion to exculpatory clauses, but it tends to produce irrational results. In

effect the majority is saying that mineral owners producing their own coal may enjoy the benefit of exculpatory clauses, while those mineral owners who want to employ independent contractors to produce coal may not enjoy the benefit of exculpatory clauses. This arbitrarily drawn distinction will make it impossible for owners of mineral interests to avail themselves of the economical means of extraction which independent contractors now provide.

In this case Junior Pocahontas, as servant of Consolidation Coal Company, is attempting to hold the plaintiffs to a promise of exculpation from liability made by plaintiffs' predecessors in title. This presents the classic question of whether the burden of a promise respecting the use of land runs with the land so as to bind successors in title to the original promisor. The *Restatement of Property* § 530 (1944) provides the basic answer:

> "Subject to the rules stated in §§ 531 to 537, the successors to land respecting the use of which the owner has made a promise become bound upon the promise as promisors."

The qualifying rules stated in §§ 531 to 537, *Id.*, do not remove this particular case from the ambit of the general rule stated in § 530. Section 531, *Id.*, states as follows:

> "The successors in title to land respecting the use of which the owner has made a promise are not bound as promisors upon the promise unless it was intended by the parties to the promise that they should be so bound."

Intention can be manifested in many ways, and in this case it is manifested most clearly and directly. The original deed of June 1, 1956, conveying the surface interest to Paul W. Jones, Trustee (party of the second part) states:

> "As a part of the consideration for this conveyance, the party of the second part covenants and agrees with the party of the first part as follows. . . . That all of the covenants, agreements and restrictions herein contained shall be bind-

ing upon the party of the second part and successors in title, and that all of said covenants shall run with the title to and be binding upon the property hereby conveyed."

This language certainly satisfies the requirement that there be manifest intention that the promise shall run.[1]

Section 532, *Id.*, deals with the formalities surrounding the making of the promise. It states:

"The successors in title to land respecting the use of which the owner has made a promise cannot be bound as promisors upon the promise unless it is made in such form as to be binding upon the promisor and is in writing under seal."

In this case the required formalities have been sufficiently observed with a deed written by grantor and accepted and recorded by grantee. The *Restatement's* seal requirement need not be observed, since West Virginia has eliminated the necessity for seals in land conveyances. *W. Va. Code*, §§ 36-3-1 and 36-3-3 (1923).

*The Restatement of Property* § 533 (1940) is concerned with the effect of recording acts:

"The successors in title to land respecting the use of which the owner has made a promise are, as against the claim that they are bound as promisors upon the promise, entitled to the protection of the recording acts."

No one has alleged that there are any irregularities in connection with the recording of the deed conveying the surface interest to Paul W. Jones, Trustee, or the deed conveying the surface interest to the Johnsons. The defendant in this action, Junior Pocahontas Coal Company, Inc., in its affirmative defense alleges that the Jones

---

[1] In this respect, *see, also W. Va. Code*, § 36-4-1 (1923) which states:

"When the words 'the said ... covenants,' are used in a deed, such covenant shall have the same effect as if it was expressed to be by the covenantor, for himself, his heirs, personal representatives and assigns, and shall be deemed to be with the covenantee, his heirs, personal representatives and assigns."

deed is recorded in the Office of the Clerk of the County Court of McDowell County, West Virginia in Deed Book No. 224 at page 34. This allegation is not controverted in the record. Plaintiffs in their complaint acknowledge that their deed to the property from Paul W. Jones, Trustee, is recorded in the same clerk's office in Deed Book No. 225 at page 458. It is worth noting at this point that the latter deed, attached as an exhibit to the Motion for Summary Judgment, specified that it

". . . is made subject to all and singular, the conditions, restrictions, exceptions, reservations and limitations as contained in all prior deeds conveying the said real estate same as though they were set out herein *in extenso*."

Section 534, *Id.* establishes the requirement of privity between the promisee and promisor:

"The successors in title to land respecting the use of which the owner has made a promise are not bound as promisors upon the promise unless

"(a) the transaction of which the promise is a part includes a transfer of an interest either in the land benefited by or in the land burdened by the performance of the promise; or

"(b) the promise is made in the adjustment of the mutual relationships arising out of the existence of an easement held by one of the parties to the promise in the land of the other."

The facts of this case bring it within the scope of § 534(a), *Id.*

Section 535, *Id.*, is concerned with privity as between promisor and successor:

"The successors in title to land respecting the use of which the owner has made a promise are not bound as promisors upon the promise unless by their succession they hold

"(a) the estate or interest held by the promisor at the time the promise was made, or

"(b) an estate or interest corresponding in duration to the estate or interest held by the promisor at that time."

Both Paul W. Jones, Trustee, and the Johnsons held the same estate in the property, although the Johnsons parcel was only a part of the larger parcel acquired by Jones. Section 536, *Id.*, takes this apportionment problem into consideration:

"The successor to the estate or interest of the promisor in any part of the land respecting the use of which he has so made a promise that it is capable of running with the land becomes proportionally liable as a promisor upon the promise."

As Comment (a) of § 536, *Id.*, makes clear, ". . . it is not a prerequisite to the running of the promise that there be a succession to the whole of the land with which the promise is capable of running. If there is a succession to a part of that land there is a succession to the obligation of the promise."

Finally, § 537 establishes a requirement that there be a relation between the benefit and burden:

"The successors in title to land respecting the use of which the owner has made a promise can be bound as promisors only if

"(a) the performance of the promise will benefit the promisee or other beneficiary of the promise in the physical use or enjoyment of the land possessed by him, or

"(b) the consummation of the transaction of which the promise is a part will operate to benefit and is for the benefit of the promisor in the physical use or enjoyment of land possessed by him,

and the burden on the land of the promisor bears a reasonable relation to the benefit received by the person benefited."

This section sets forth in formal language the requirement that the promise must "touch and concern" the

land with which it runs. It is clear that the exculpatory clause directly touches and concerns the property respecting the use of which the promise was originally made.

There is also a question in this case whether the benefits of a promise respecting the use of land run with the land so as to entitle successors to the original promisee to enforce the promise. In property law this question is traditionally less controversial than the question whether the burdens of a promise run with the land. The general rule is stated as follows in § 542, *Id.:*

"(1) A person other than one initially entitled to enforce the obligation of a promise respecting the use of land may acquire the ability to enforce the obligation of the promise by succession to the land of one initially entitled to the benefit of the promise.

"(2) When succession to the ability to enforce a promise occurs in the manner described in Subsection (1), the promise is said to run with the land."

Since the qualifications in subsequent sections do not change the operation of the general rule in the case, and since many of the qualifications are similar to those discussed in connection with the running of burdens, I will forego further discussion at this point.[2] *See,* §§ 543-553, *Id.*

---

[2] There is only one question that might arise in connection with the running of benefits in this case. That is whether the running of the benefits would be affected in any way by the fact that Consolidation, as lessee, succeeded to only part of the estate held by New River, the original promisee. Again, the *Restatement of Property* (1944) provides the answer. Section 547, *Id.*, states as follows:

"The benefit of a promise respecting the use of land of the beneficiary of the promise can run with the land only to one who succeeds to *some* interest of the beneficiary in the land respecting the use of which the promise was made." (Emphasis added)

By comparing this section with § 535, *Id.*, (set out in the text of the opinion) one can see that the rule as to the running of benefits is less stringent than the rule as to the running of burdens. The

Representative West Virginia cases applying these principles include *Hurxthal v. Boom Co.*, 53 W. Va. 87, 44 S.E. 520 (1903); *Parsons v. Baltimore, etc., Loan Ass'n.*, 44 W. Va. 335, 29 S.E. 999 (1898); *Lydick v. Baltimore & O. R. Co.*, 17 W. Va. 427 (1880); and *Ballard v. Kitchen*, 128 W. Va. 276, 36 S.E.2d 390 (1945).

I might be more receptive to the majority's view in this case if it were supported by persuasive and well-reasoned precedent which seemed to dictate the result reached, or at least seemed to undermine the traditional analysis I have set forth above. The decision, however, is based primarily upon public policy analysis, and the citation of authority is unconvincing. The majority opinion turns upon the distinction between privity of estate and privity of contract and cites the following passage from *Am. Jur.* 2d in that connection:

> "A distinction is made between privity of contract and privity of estate, and the rule is that privity of contract alone is insufficient to carry the benefit of a covenant to subsequent owners of the property. Similarly, a difference is indicated between the benefit and the burden with respect to the necessity for privity of estate. Thus, while the benefit, upon a transfer of land, will pass with the property to which it is incident, the burden or liability will be confined to the original covenantor, unless the relation of privity of es-

---

liberality of § 547, *Id.* is well explained by Comment (c) of § 547, the pertinent part of which states:

"The concept of identification, upon which the running of both the burden and the benefit of promises respecting the use of land is based, presupposes a succession to an interest in the land with which the promises run. Historically, such a succession meant a succession to the interest of the predecessor in that land. This historical rule is still applicable in the case of the running of the burden (*see* § 535). It is no longer true with respect to the running of the benefit. The benefit will run with any part of the interest of the beneficiary of the promise if the part succeeded to is of such a character that performance of the promise will be of benefit to the owner of it."

The illustration given in Comment (c) *Id.* lays to rest all doubt that a lessee succeeds to the benefits of a promise and is entitled to enforce the promise.

tate exists or is created between the covenantor and the convenantee at the time when the covenant is made." 20 *Am. Jur.* 2d, *Covenants, Conditions, and Restrictions* § 34 (1965).

A careful reading of this passage, as well as the text preceding and following it in *Am. Jur.* 2d, shows clearly that the passage has no application to the facts at hand. Privity of estate is defined in *Am. Jur.* 2d as "a mutual or successive relationship to the same rights of property." *Id.*, § 34. This definition and my discussion of the law of covenants both indicate that the benefit of the exculpatory clause has run from the original convenantor, New River and Pocahontas Consolidated Coal Company, to its successor, Consolidation Coal Company, while the burden has similarly passed from the original covenantee, Paul W. Jones, to his successors, including the plaintiffs in this action. Therefore, all parties having rights to this particular property are bound by the exculpatory clause. The privity of contract distinction has been thrown into the analysis as a red herring. The contractual relationship between Consolidation Coal Company and Junior Pocahontas does not involve land covenants or rights to property, but rather is an employment relationship in which Junior Pocahontas as employee has undertaken to perform work for Consolidation, employer. The following example illustrates the flaws in the majority's analysis. Suppose Mr. Smith sold a piece of his property to Mr. Jones for a building lot and Mr. Jones convenanted to observe a 50' setback line. Subsequently, Mr. Jones has the XYZ Construction Company begin a house on the building lot with only a 25' setback. Mr. Smith seeks to enforce the covenant, only to be told that under the reasoning of this case the covenant cannot be enforced against an independent contractor such as the XYZ Construction Company.

This could not actually happen, since the rule of this case is limited to exculpatory clauses. The limitation obviously springs from the most compelling necessity. Were the logic of the independent contractor exception to be applied to covenants other than exculpatory

clauses our law of property would be thrown into mass confusion. Again, I repeat, if we are going to give exculpatory clauses special treatment, let us do so directly and straightforwardly. Let us develop a special rule which deals with the peculiar and unique characteristics of exculpatory clauses. Why turn to a general rule, such as the independent contractor exception, and then limit its application to one special situation because its universal application would be unsound and unwise?

Among all the branches of the law, property law may have the highest requirements for stability. In the factual context under consideration a reasonable compromise must be made between adequate respect for the sanctity of contracts and the public policy against grossly inequitable oppression of the weak by the strong. If we met this issue directly, we would probably be concerned with the allegations in the complaint that the work was done negligently and with indifference to injury to the surface. To what extent are exculpatory clauses which may have been dormant for three quarters of a century still valid in light of the need to use the surface of the land in a growing State? What are the responsibilities of the extractors of minerals to protect their fellow human beings from misery and destruction? What is the effect on industry and the eminently legitimate enterprise of mineral extraction of not enforcing exculpatory clauses upon which generations of businessmen have relied? Ultimately we must reach these issues.

Much of the foolishness in the law finds its origin in attempts by judges to find general rules for the disposition of peculiar cases. The majority opinion is an example of this process in action. Technicality upon technicality have been released upon an unsuspecting bar by the inveterate predilection of judges to use technique, i.e., nice legal distinctions which give the appearance of applied logic, instead of cogent functional analysis. When urgent public policy requires a change in settled law, that is what should be done. If the opinion will not write honestly (in the sense of intellectual integrity), it should not be written.